# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **GATEWAY SYSTEMS, Inc. and GATEWAY WEB SERVICES, INC.,** )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>**CHESAPEAKE SYSTEMS SOLUTIONS, INC.,** )<br>)<br>Defendants. )<br>) | No. 10 C 2276 |

## ORDER

Before me is Chesapeake's motion for a preliminary injunction seeking to order Gateway (by which I mean the Gateway entities, collectively) to 1) provide Chesapeake with a complete copy of the source code version of the software Chesapeake licenses pursuant to the parties' agreement; 2) provide Chesapeake with renewed license keys to the software so that Chesapeake's customers (who sublicense the software) can continue to use the software after the December 31, 2010 expiration of the current keys; and 3) cease solicitation of Chesapeake's current customers in violation of the parties' non-solicitation agreement. On July 22, 2010, Magistrate Judge Keys issued a Report and Recommendation that I deny Chesapeake's motion. Having reviewed Chesapeake's objection (and reply) to the magistrate judge's report, Gateway's response to that objection, and the underlying briefs and exhibits that were before the magistrate judge, I am persuaded that a preliminary injunction is

appropriate.[1]

As to the first issue - the source code - I agree with the magistrate judge that the amendment to the parties' original agreement plainly requires Gateway to provide Chesapeake with the source code promptly upon development. Gateway's efforts to twist the meaning of the agreement's clear language are unavailing, and its argument that Chesapeake has "waived" strict performance is similarly unpersuasive, particularly in light of the provision in the agreement that failure by either party to enforce its rights under the agreement will not constitute waiver. And although the contract does not contain provisions relating to the license key, it seems obvious that without a renewed key, Chesapeake would be deprived of the benefit of its bargain, since ongoing clients to whom it has sublicensed Gateway's software would abruptly lose access to that software at the end of the year.

Even assuming Gateway's putative termination of the contract is valid (a conclusion that is far from clear on the current record), the parties' amended agreement, on its face, allows Chesapeake to continue, post-termination, to have sufficient access to the source code to meet its ongoing support obligations to clients. To the extent license keys are also necessary to this end, Gateway's obligation to provide them is implicit. For these

---

[1] Pursuant to U.S.C. § 636(b)(1)(C), my review of the portions of the magistrate judge's Report and Recommendations to which Chesapeake has objected is *de novo*. Further, I may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id*.

reasons, I conclude that Chesapeake is likely to succeed on its claim of entitlement to both the source code and license key.

I further agree with the magistrate judge's conclusion that if Chesapeake is unable to meet its obligations to its customers, harm to its reputation and goodwill is "almost guaranteed," and that this harm would be irreparable and not compensable by damages. Although Judge Keys made no explicit factual finding that Chesapeake would, in fact, be unable to meet its obligations to its sublicensees without the source code and license keys, that finding is implicit in his conclusion that Chesapeake met its threshold burden, and indeed the record supports it.

I respectfully differ, however, with the magistrate judge's conclusion that the balance of harms tips in Gateway's favor. The only potential harm that Gateway has identified is the possibility that Chesapeake would vindictively release the source code to the public in an effort to "sink" Gateway. Even assuming that a hot-headed Chesapeake officer made such a threat, the likelihood that he would bring it to fruition, considering the deleterious effects such a maneuver would have on Chesapeake's own business, not to mention the serious legal consequences Chesapeake would certainly incur if it took this step (particularly having represented to me that it would not), is remote. As between the parties, the risk of concrete harm to Chesapeake if it has neither the source code nor the license keys (nor Gateway's cooperation, which at this point seems unrealistic) to enable it to continue servicing its clients

outweighs the potential, but seemingly unlikely, harm Gateway would suffer if forced to turn over these items. Moreover, the interest of Chesapeake's clients in maintaining uninterrupted access to the software militates in favor of ordering Gateway to provide Chesapeake the source code and license keys. In short, I conclude that the balance of harms favors granting the injunction as to these items.

As to the third item – an injunction ordering Gateway not to solicit Chesapeake's customers – the magistrate judge concluded that the restrictive covenant, although generally reasonable in scope, is likely unenforceable due to its unlimited duration. In its objections, Chesapeake argues that this conclusion is erroneous because in fact, the covenant is not perpetual but is reasonably limited to the duration of the contract.[2]

Although the restrictive covenant does not set forth a particular term, the provision establishing the covenant is not listed among those that survive termination. I therefore agree with Chesapeake that the restriction is of limited duration. I also respectfully disagree with the magistrate judge's conclusion that the parties' agreement should be treated like an employment agreement. Gateway plainly is not the equivalent of an employee

---

[2] In its reply, apparently after unearthing authority to support its position, Chesapeake argues that the non-solicitation restriction "may continue indefinitely." (Citing, for the first time, *Abbott-Interfast Corp. v. Hakabus*, 619 N.E.2d 1337, 1341 (Ill. App. Ct. 1993). Chesapeake does not explicitly change its position that the covenant is limited to the term of the agreement, and this is how I interpret the agreement.

of Chesapeake. While the agreement also does not fit squarely into the alternative, "sale of a business" mold, as between the two analytical options, the latter appears to be a closer fit.[3] Both parties are sophisticated business entities with equal bargaining power, and there is no apparent dispute that the purpose of the covenant is to ensure that the value of the asset purchased (the license to Gateway's software) is not eviscerated by the seller's competition. These are the factors Illinois courts have considered in determining the degree of scrutiny to apply to such covenants. *See Hamer Holding Group, Inc. v. Elmore*, 560 N.E.2d 907, 915 (Ill. App. Ct. 1990). The asset Chesapeake purchased in the agreement is not, as in most sale-of-business cases, the goodwill of the seller; but the value of the asset--the right to license Gateway's software to its own customers--would indeed be merely "chimerical" if Gateway itself could target Chesapeake's customers and license its software to them directly. *See id.*

Applying the sale-of-business analysis, Chesapeake must establish only that it has a protectable business interest, and

---

[3]Although neither party has argued that the agreement is unlike either employment or sale-of-business agreements, it seems to me that the agreement is actually more like a franchise agreement than it is like either of the alternatives presented. There is support in Illinois law for enforcing restrictive covenants in the franchise context, provided they are reasonable, during the term of the agreement. *See McDonald's System, Inc. v. Sandy's Inc.*, 195 N.E.2d 22 (1963) (non-compete provision in franchise agreement that ended with termination of agreement enforceable). The parties' non-solicitation agreement would also be enforceable under this analysis, at least pending the ultimately resolution of Gateway's claim that it terminated the parties' agreement.

that the restrictive covenant is reasonable. *Central Water Works Supply, Inc. v. Fisher*, 608 N.E.2d 618, 622-23 (Ill. App. Ct. 1993). Gateway insists that customer lists are not protectable; but Chesapeake has provided Gateway substantially more information than merely the identities of its customers, information which would give Gateway a competitive advantage vis-à-vis Chesapeake's customers. Moreover, the parties agreed that customer information was to be treated as confidential, bolstering the inference that the information is a valuable business asset. And despite Gateway's protestations to the contrary, the covenant itself is not excessively broad: it prohibits only solicitation of a closed set of entities Chesapeake has identified to Gateway, and it contemplates two exceptions to the prohibition. The first exception provides that Chesapeake customers to whom Gateway has previously licensed software as of the date of the agreement are not subject to the non-solicitation restriction. The second provides that if Chesapeake is not "actually marketing or promoting the Gateway Software" to a customer, and Chesapeake does not begin actively marketing the software to that customer within ten days after Gateway provides written notice to Chesapeake, the non-solicitation restriction does not apply to that customer.

Gateway insists that an injunction is inappropriate because Chesapeake has offered no evidence of solicitation. Gateway explains that the customer contacts Chesapeake complains about do not constitute solicitation because the customers approached

Gateway, not vice-versa. This argument ignores a) Chesapeake's evidence that in at least one other instance, it was Gateway who first contacted the customer (albeit purportedly by mistake), and b) that in any event, solicitation does not hinge on who contacts whom, as Gateway's own authority implicitly acknowledges. In *Smith, Walters, Kuhen, Burnett & Hughes, Ltd. v. Burnett*, 548 N.E.2d 1331 (Ill. App. 1989), on which Gateway relies, the court considered a non-solicitation agreement that barred the restricted employee both from contacting his former employer's clients for the purpose of doing business, and from "accepting business from any client" of the employer. *Id.* at 1332. The court noted that the employee had, consistent with his obligation under this second restriction, informed clients of his former firm who initiated contact with him that he could not accept their business. Although the court ultimately vacated the injunction on other grounds, nothing in its discussion suggests that the prohibition in that case on "accepting business" from the firm's clients exceeded the definition of "solicitation" under Illinois law. Indeed, courts applying Illinois law have defined solicitation to encompass any direct contact that the recipient would understand as a solicitation for business. *See YCA, LLC v. Berry*, No. 03 C 3116, 2004 WL 1093385 at *10 (N.D. Ill. May 7, 2004)(Leinenweber, J.); *Henry v. O'Keefe*, No. 01 C 8698, 2002 WL 31324049, at *5 (N.D. Ill. Oct. 18, 2002)(Kennelly, J.); *Tomei v. Tomei*, 602 N.E.2d 23, 26 (Ill. App. Ct. 1992).

Finally, although Gateway does not explicitly contend that its contacts with Chesapeake's customers fall within either exception carved out of the parties' non-solicitation agreement, it states that Chesapeake "passed" on marketing Gateway's Risk Management Module, hinting that the second may apply. Gateway may, indeed, be entitled to market its Risk Management Module to Chesapeake's current customers if Chesapeake elects not to do so; but to invoke the exception established by the agreement, Gateway must follow the specified procedure, which requires written notice to Chesapeake. Gateway does not claim to have followed this procedure, and the facts contained in Orazio Pater's affidavit and additional exhibits are insufficient to establish that the second exception applies.[4]

The present record leaves little doubt that Gateway has solicited Chesapeake's customers in violation of the parties' agreement. And Chesapeake's potential loss of customers and sales as a result of Gateway's violation, and the threat that such losses will continue if an injunction is not granted, are sufficient grounds to justify preliminary relief. *Central Water Works*, 608 N.E. 2d at 623.

****

---

[4] Mr. Pater states that "At two recent trade shows (Windy City Summit and New York Cash Exchange), Chesapeake did not display the "Smart Treasury" product (which is Chesapeake's marketing name for Gateway's software)." While this evidence may support Gateway's termination of the contract, it is insufficient to show that Gateway's contacts with any particular Chesapeake customer falls within the exceptions to the non-solicitation agreement.

For the foregoing reasons, Gateway is ordered: 1) to deliver to Chesapeake, for the purpose of servicing its customers who sublicense the Gateway software, the source code version of the software that Chesapeake licensed pursuant to the parties' agreement; 2) to deliver to Chesapeake renewed "license keys" necessary for Chesapeake's clients who sublicense the Gateway software to continue using that software after December 31, 2010; and 3) to cease soliciting any current Chesapeake customer for licensing of the Gateway software unless it provides Chesapeake written notice to begin actively marketing the Gateway software to that customer and Chesapeake fails to do so within ten days of the date of that notice.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: September 14, 2010