**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **GATEWAY SYSTEMS, Inc. and GATEWAY WEB SERVICES, INC.,** | ) |
| | ) |
| Plaintiffs, | ) |
| | )    No. 10 C 2276 |
| v. | ) |
| | ) |
| **CHESAPEAKE SYSTEMS SOLUTIONS, INC.,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

MEMORANDUM OPINION AND ORDER

On April 14, 2010, plaintiff Gateway Systems, Inc., initiated this litigation against Chesapeake Systems Solutions, seeking declaratory, injunctive, and, in the alternative, other relief for alleged breaches of the parties' software license agreement.[1] Gateway has since amended its complaint, and now operative is its second amended complaint, which names Gateway Web Services as an additional plaintiff, as well as G Treasury SS as a third-party defendant.[2] Now before me are cross-motions for partial summary judgment, which seek resolution of the following issues: 1) whether Gateway breached the parties' agreement when it purported to terminate the contract without providing Chesapeake notice of any

---

[1]I use the terms "contract" and "agreement" interchangeably to refer generally to the parties' 2003 Agreement, attached as Exh. 3 to Gateway's SOF, and the 2005 Amendment, attached as Exh. 4 to Gateway's SOF, collectively.

[2]I refer to these entities collectively as "Gateway."

1

alleged breach and opportunity to cure; 2) whether Chesapeake is entitled to, and Gateway must provide, the source code version of the software, license keys, the license key "generator," and all modules, enhancements, and updates to the software, and whether Gateway breached the agreement by failing to provide these items; 3) whether Chesapeake underreported or underpaid license fees owed to Gateway by excluding certain categories of fees Chesapeake received from its software customers when calculating Gateway's royalty payments; 4) whether Chesapeake materially breached the contract by licensing the software outside the United States; and 5)whether Gateway solicited Chesapeake's customers in violation of the contract's non-solicitation provisions.

In addition, Chesapeake seeks summary judgment that: 1) the "best efforts" clause of the parties' agreement is unenforceable, or, alternatively, that even if it is enforceable, Gateway cannot show that Chesapeake breached that provision; 2) Gateway cannot prevail on its claims that Chesapeake failed to provide first-line customer support, failed to properly install the software, or failed to refer customers to Gateway pursuant to Section 4.7 of the 2003 Agreement; and 3) Chesapeake did not anticipatorily repudiate the contract. Gateway, for its part, seeks summary judgment that: 1) Chesapeake has not paid licensing fees that have been due since the beginning of 2010; and 2) Chesapeake is not entitled to damages in the claimed amount of $19,000,000, which includes damages for

lost profits or consequential damages.

I.

The history leading up to the current dispute is fraught with more than the usual intrigue--much of which is the subject of ongoing litigation in state court, and need not be recounted here-- as well as a good dose of animosity. Gateway is the developer and owner of treasury management software that Chesapeake distributes and markets pursuant to the parties' agreement.[3] Gateway also markets this software itself, and Chesapeake, for its part, also develops and markets its own software. The parties' agreement grants Chesapeake a non-exclusive right to license Gateway's software in the United States and Canada.

Chesapeake's customers of the Gateway software come in two varieties: "installed" clients, who access the software from an application installed on the clients' own computers, and "hosted" (also referred to as "ASP" or "web-based") clients, who access the software remotely via the Internet. Chesapeake typically provides and maintains the necessary hardware for its "hosted" clients, and also provides internet connectivity so that these clients can access the software. A number of Chesapeake's "hosted" clients

_____

[3]There is a dispute over which Gateway entity now owns the right to receive royalties under the parties' agreement. Although I need not (and, indeed, should not) resolve this dispute, as it is among the issues I understand are pending before the state court, its existence is relevant to my analysis of Gateway's claim for unpaid royalties, as discussed below.

license the Gateway software through Bank of America, which itself licenses it from Chesapeake.

At some point in the parties' relationship, Gateway became dissatisfied with Chesapeake's performance. According to Gateway, its president, Orazio Pater, discussed perceived shortcomings in Chesapeake's performance in November of 2009 and provided Chesapeake with a list of "action items" at that time. Chesapeake acknowledges the "action items" list but disputes that Gateway expressed its position that Chesapeake was in breach of the parties' agreement at that time.

Then, in March of 2010, the parties' relationship apparently took an abrupt turn for the worse. After several unsuccessful attempts to obtain the "source code version" of the software, Chesapeake gave Gateway written notice, on March 29, 2010, that Gateway was in material breach of the parties' agreement for failing to provide the source code. Then, on April 14, 2010, Gateway's counsel filed the present lawsuit and also sent two letters to Chesapeake, each of which alleged various breaches of the parties' agreement. One of these letters purported to terminate the parties' agreement immediately based on Chesapeake's alleged failure to use its "best efforts" to market the Gateway software as required by Section 3.3 of the agreement--a breach of which Chesapeake had been on notice, Gateway claimed, since November of 2009. The other letter stated, among other things,

that Chesapeake's president, Peter Vogelberger, had threatened to use the source code to "sink" Gateway. The letter opined that for this reason, among others, any duty Gateway ever had to provide Chesapeake with the source code was extinguished. Gateway then sent another letter on May 14, 2010, claiming that Chesapeake had not cured the breaches identified in the letters of April 14, 2010, and again declaring the agreement terminated. Meanwhile, on May 5, 2010, Chesapeake sought a preliminary injunction ordering Gateway to provide Chesapeake with the source code version of the software and the "license key generator" to enable Chesapeake's clients to continue using the software, and enjoining Gateway from soliciting Chesapeake's customers. I granted that motion in most material respects. *See Gateway Systems, Inc. v. Chesapeake Systems*, No. 10 C 2276, 2010 WL 3714588, at *1 (N.D. Ill. Sept. 14, 2010).[4]

## II.

Because whether Gateway properly terminated the parties' agreement is a threshold question to resolving many of the issues presented for summary judgment, that is where I begin my inquiry. I conclude that Chesapeake is entitled to summary judgment on this issue.

Gateway argues that it properly terminated the agreement in

---

[4]Whether Gateway has complied with the preliminary injunction order is the subject of a pending motion for a rule to show cause (Docket No. 201). Chesapeake has requested that I reserve ruling on that motion.

accordance with its provisions, and, specifically, that Gateway was not required to provide Chesapeake with notice of an alleged breach and an opportunity to cure before terminating the contract. This argument relies on an untenable interpretation of Section 9.2. That section, which falls under the heading "Term and Termination," reads, in its entirety:

> In addition, if either party defaults in the performance of any material provision of this Agreement, the non-defaulting party may give written notice to the defaulting party that if the default is not cured within thirty (30) days, the Agreement shall automatically terminate at the end of such period; if the party receiving such notice fails to timely make such cure, this Agreement shall terminate in accordance with such notice.

The "in addition" indicates that Section 9.2 expands upon the immediately preceding Section 9.1. Section 9.1 establishes that the initial term of the agreement is four years, and that the agreement will renew automatically on an annual basis thereafter unless one of the parties provides written notice, prior to the end of the then-current term, of its intent not to renew.[5] The import of Section 9.2, then, is to establish a procedure for terminating

_____

[5]Section 9.1 was amended in 2005 to establish an initial fifteen year term, with automatic annual renewal thereafter, again absent prior written notice of an intent not to renew. The amended Section 9.1 also provides, "Notwithstanding any other provision herein, upon and after any termination or expiration of this Agreement, Chesapeake may continue to use the Source Code Version of non Replacement Software and the Toolkit solely to provide maintenance and support to customers who continue to use the Gateway Software." This provision will be addressed further below.

the agreement mid-term on the ground of breach, which the parties may invoke rather than waiting until the end of the term to exercise the non-renewal option of Section 9.1. Read in this light, it is clear that the "may" of Section 9.2 signifies the existence of an alternative to non-renewal in the context of breach. It does not mean, as Gateway argues, that the notice-and-cure procedure established in that section is optional.

Nor is recourse to Section 9.2 itself optional. Gateway argues that Section 12.2 establishes an "alternative" termination procedure that does not require the opportunity to cure, and that Gateway properly elected to terminate the agreement under this procedure, rather than to invoke Section 9.2. But the interpretation of Section 12.2 as an "alternative" to Section 9.2 is without support in the text of the agreement. Section 12.2 governs dispute resolution, and it does not address, or even contain the word, "termination." Indeed, the progressive dispute resolution procedure set forth in Section 12.2, which contemplates a written exchange between the parties, then mediation, and ultimately litigation to resolve their differences, provides a detailed framework for resolving disputes short of termination, in a manner that enables the contract to remain in effect. Gateway cannot avoid the notice and cure requirements of the contract's explicit termination provisions on the theory that a separate provision that does not explicitly address termination somehow

implicitly establishes an "alternative" termination procedure to one that does. In short, Gateway was required to provide Chesapeake with notice and the opportunity to cure any alleged breach before terminating the contract on the basis of that breach. Because the record demonstrates conclusively that it did not do so, and notwithstanding Gateway's histrionic assertions of Chesapeake's bad faith,[6] Chesapeake is entitled to summary judgment that Gateway's termination was improper.

Nor does the record support Gateway's claim that Chesapeake breached the contract's "best efforts" clause--the breach Gateway originally claimed justified its termination.[7] Amended Section 3.3 provides, "Chesapeake agrees to use commercially reasonable best

---

[6]Gateway dedicates an entire section of its factual recitation to the theme, "Discovery of Chesapeake's Bad Faith." Having carefully reviewed the record--including the evidence Gateway cites in support of its assertions that certain of Chesapeake's representations to Gateway and to me were "a ruse," "a lie," and "a sham"--I conclude that these nefarious sounding allegations are largely, if not entirely, without support. Moreover, Gateway's argument that termination was justified based on Chesapeake's alleged bad faith presumes that Chesapeake's conduct amounted to a breach of the parties' agreement. But, as I have just concluded, proper termination for breach must adhere to Section 9.2 in any event.

[7]Gateway's theory of breach has evolved substantially since that time, as is clear from its Second Amended Complaint, which asserts a number of additional breaches. Chesapeake is obviously on notice, now, of all of these purported breaches, but it seems clear at this juncture that Gateway has not offered, and does not intend to offer, an opportunity to cure. Accordingly, regardless of how I resolve Gateway's claims regarding the other alleged breaches, Gateway's termination of the contract violates Section 9.2 of the parties' agreement.

efforts throughout the term of this Agreement to promote, market and distribute the Gateway Software either directly or through Resellers to End Users." Chesapeake asserts that this clause is unenforceable, but I need not decide the issue because even assuming that it is enforceable, Gateway has not demonstrated that it could persuade a reasonable jury that Chesapeake breached it. Gateway relies entirely on Chesapeake's loss of business (the magnitude of which Chesapeake disputes), Chesapeake's alleged failure to win new business, and Chesapeake's putative incompetence in demonstrating, installing, and supporting the software. But Gateway offers neither argument nor authority to explain how these shortcomings prove that Chesapeake failed to use its "best efforts" to promote and market the software.

Moreover, even assuming Gateway's theory had legs conceptually, the factual support for it is simply too scant to survive summary judgment. Questioned about the basis for Gateway's claim, Oracio Pater, Gateway's Rule 30(b)(6) witness, cited non-specific customer feedback (about which Mr. Pater admitted to having no detailed, personal knowledge) that Chesapeake's demonstration of the software was "somewhat confused amongst the other Chesapeake products," and equally vague feedback from Chesapeake personnel that they were "not totally comfortable with the capabilities of the system and in their abilities to present the best features of it." Pater Dep., Chesapeake's SOF, Exh. 17 at

152:20-24, 153:9-15.  Mr. Pater then conceded that Gateway's claim
was otherwise rooted in "only conjecture based on a lack of
results." *Id.* at 154:2-3.  This evidence is simply too slim a reed
to support Gateway's claim that Chesapeake breached the "best
efforts" clause of the parties' agreement.

For similar reasons, Chesapeake is entitled to summary
judgment of Gateway's claim that Chesapeake breached its obligation
to provide first-line customer support.  The 2003 Agreement defines
Chesapeake's support obligations in Section 4.1.2:

> Chesapeake shall be responsible for providing first line
> support for the Program sublicensed by Chesapeake.  For
> purposes of this Agreement, "first line support" shall
> consist of (i) receipt and acknowledgment of a problem
> from an End User, (ii) checking lists of known problems
> and workarounds, and (iii) if the reported problem is
> known, Chesapeake will give the published answer to the
> End User and assist with the implementation of the
> solution, and/or (iv) duplicate the problem before it is
> passed on to Gateway.

An affidavit submitted by David Tanner, Chesapeake's Senior
Vice President and co-founder, states that Chesapeake's routine
practice was to take, at a minimum, the four actions required by
Section 4.1.2.  Tanner Aff., Chesapeake's SOF, Exh. 9 at ¶ 4.
Nothing in Gateway's opposition controverts this evidence, or
otherwise suggests that Chesapeake failed to satisfy these
obligations.  Instead, Gateway argues that Chesapeake "has no idea
how to service and support the Gateway software," and points to the
testimony of two customers who were dissatisfied with Chesapeake's
support.  But whether customers were satisfied with the support

Chesapeake provided is an entirely different question from whether Chesapeake performed as required under its contract with Gateway, and none of the testimony Gateway cites provides any basis for concluding that Chesapeake did not take any of the actions it was contractually required to perform. Accordingly, Gateway is not entitled to a jury trial of its claim that Chesapeake failed to provide "first-line" support.

Gateway's claim of anticipatory breach/repudiation is similarly defective. Gateway rests the claim on allegations that Chesapeake's president, Peter Vogelberger, threatened to use Gateway's "confidential information," including the source code, to "sink" Gateway, and on evidence that purportedly corroborates this threat. Chesapeake argues, relying on *Truman L. Flatt & Sons Co. v. Schupf*, 649 N.E.2d 990, 994 (Ill. App. Ct. 1995), that such a threat, even if true, is too doubtful and indefinite to amount to an anticipatory repudiation. "The doctrine of anticipatory repudiation requires a clear manifestation of an intent not to perform the contract on the date of performance. The failure of the breaching party must be a total one which defeats or renders unattainable the object of the contract." *In re Marriage of Olsen*, 528 N.E.2d 684, 686 (Ill. App. Ct. 1988). Standing alone, Vogelberger's alleged threat to "sink" Gateway simply does not amount to a "definite and unequivocal manifestation that [Chesapeake] will not render the promised performance." *Truman L.*

*Flatt*, 649 N.E.2d at 994.

Moreover, Gateway's argument that Chesapeake further repudiated the contract "by entering into an agreement with a third-party to supply Gateway's source code" is not supported by the evidence. For evidence of this "agreement," Gateway points to § 8.1.1 of the Assignment Agreement between Global Treasury Systems, a wholly owned subsidiary of Chesapeake (the "Assignor" under that agreement) and Turnaround Capital Partners, a Gateway lender (the "Assignee"). Gateway's SOF, Exh. 33. That section, entitled "*Release to Assignor*," states, "[t]he Purchase Escrow shall be released to Assignor upon Assignee acquiring good and marketable title to the source code version of the latest software build, including all components in the hands of G Treasury SS, LLC...." The "Purchase Escrow" is defined in § 3.1.1. of the Assignment Agreement as a certain amount of money that will be deposited into an escrow account the parties agree to establish. Thus, by its terms, § 8.1.1 of the Assignment Agreement contemplates the release of *money* to Gateway's lender, not the release of the source code itself. And, although Gateway states in response to Chesapeake's motion that Gateway details the "scheme" to "give away Gateway's source code" in the memorandum supporting Gateway's own summary judgment motion, the referenced argument does not cite any additional facts that reasonably can be interpreted as supporting such a scheme. Chesapeake is entitled to judgment on

Gateway's claim of anticipatory repudiation.

Chesapeake is also entitled to summary judgment of Gateway's claims that it failed to properly install the program and failed to refer dissatisfied customers to Gateway. Chesapeake argues that both of these claims seek to impose obligations not present in the parties' agreement, and that the second claim, is, in addition, belied by specific facts in the record. Gateway does not respond to Chesapeake's arguments on these issues, and I see no basis in the record for submitting these claims to a jury.

Before returning to issues on which both parties seek summary judgment, I briefly address Gateway's request for summary judgment that Chesapeake "has refused to pay the fees due." There is, indeed, no dispute that Chesapeake owes some amount of licensing fees to some Gateway entity. But the record reflects a genuine dispute as to both the amount that is due and the entity that is entitled to payment. Accordingly, further proceedings must be held to determine how much and to whom Chesapeake must pay. Moreover, I decline to hold, in the present circumstances, that Chesapeake's failure to remit any licensing fees to Gateway since early 2010 amounts to a material breach of the parties' agreement.[8] I therefore decline to grant Gateway's motion on this issue, and my

---

[8]There appears to be no dispute that Chesapeake has paid, and continues to pay, all such fees into a secure escrow account, and that those fees will be released to the proper Gateway entity upon ascertainment of which entity that is.

previous order that Chesapeake must pay the licensing fees that are undisputedly due into a secure escrow account remains effective.

Turning now to the issue of whether Chesapeake has underreported and underpaid the fees it owes Gateway, I conclude that Gateway is entitled to partial summary judgment. The parties disagree about the interpretation of Section 6.B., which paragraph 16 of the 2005 Amendment, adds to Exhibit B (titled "Fees") to the 2003 Agreement. Section 6.B. provision reads:

> Fees actually collected from customers resulting from licensing the Gateway Software as an ASP Service shall be distributed with Seventy Five Percent (75%) being paid to Chesapeake and Twenty Five Percent being paid to Gateway. All other licensing of Gateway software shall be at the rates and fees as set forth in the Agreement.

Gateway's SOF, Exh. 5 at 7. The parties' dispute centers around the phrases "fees actually collected" and "resulting from licensing the Gateway Software." There appears to be no dispute that the purpose of § 6.B. was to establish the fee-splitting arrangement that would apply to payments Chesapeake would receive, pursuant to the terms of the 2005 Amendment from its "hosted" customers. According to Gateway, the unambiguous meaning of § 6.B. is that Gateway is entitled to twenty-five percent of all money Chesapeake collects for the totality of the products and services Chesapeake provides to enable customers to use the web-based application, including, in addition to the Gateway software itself, Internet connectivity, hardware maintenance, and hosting services. Gateway argues that the twenty-five/seventy-five percent royalty split of

14

fees received from web-based clients (as compared to the sixty-forty and fifty-fifty splits that apply to the fees received from "installed" clients) reflects the parties' acknowledgment that Chesapeake would incur additional costs for these services, and therefore would be entitled to keep a larger portion of the total fees collected. Thus, to allow Chesapeake to deduct payments for these services before calculating Gateway's twenty-five percent share would, Gateway argues, amount to a "double deduction" for Chesapeake, and would not reflect the parties' agreement.

Chesapeake disagrees, claiming that the agreement reflects the parties' understanding that Gateway would be entitled to twenty-five percent of software licensing fees that Chesapeake collected from "hosted" customers, but would not receive any portion of fees generated by other services Chesapeake provided to its hosted clients, such as hardware maintenance and Internet connectivity. Chesapeake argues that its own interpretation is supported by the text of the agreement as well as by common economic sense.

Chesapeake's argument begins by explaining that the "logical" place in the 2003 Agreement to insert § 6.B., which is labeled "Fees Relating to the Licensing of the Web Based System and ASP Services," is at the end of Section 1 (captioned "License Fees") of Exhibit B. Chesapeake then argues that when § 6.B. is understood as a subsection of Section 1, it is clear that the twenty-five percent royalty set forth in § 6.B. is to be calculated only on

"license fees." Chesapeake insists that Gateway's interpretation would produce what it calls the "absurd result" that Chesapeake would be required to pay royalties to Gateway on payments compensating Chesapeake for services that it provides, for which Gateway has no responsibility. Chesapeake explains that it passes the cost of providing these services on to its customers and argues that Gateway is not entitled to a portion of the fees it collects to recoup these costs.

Chesapeake's interpretation cannot be squared with the language or the overall thrust of the parties' agreement. To begin with, as Chesapeake itself observes, the 2005 Amendment *added to* the terms of Exhibit B, it did not replace those terms. The original Exhibit B contained Sections 1 through 4. The 2005 Amendment provides, "[t]he following language shall be added to Exhibit B," then sets forth sequential paragraphs beginning with paragraph number 5.[9] Accordingly, the most logical place to insert the newly minted Sections of Exhibit B is at the end of the original Exhibit B, which would create a sequentially numbered, Amended Exhibit B comprising both the old and the new provisions. The result would be seven numbered paragraphs, each relating to a

_____

[9]It is true that the numbering is not entirely sequential, as Sections 5 and 6 are immediately followed by Section 8. I interpret this as merely a scrivener's error, however, since the overall language and context clearly favor the interpretation that the new paragraphs were intended to be added after Section 4 of the original Exhibit B.

particular category of fees (or, in one case, to discounts).

Moreover, there is nothing inherently "absurd" about Gateway's earning a portion of payments that Chesapeake receives for the additional services it provides in conjunction with its sublicense of the ASP version of Gateway's software. After all, Chesapeake is entitled to seventy-five percent of the fees paid for these services, which it would not provide at all absent the Gateway software license. This scenario is distinguishable from the one in *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856 (7th Cir. 2002), where the plaintiff--a trademark broker--asserted an entitlement to a commission on a transaction wholly outside the scope of the brokerage agreement. Here, by contrast, the services Chesapeake seeks to exclude from the scope of § 6.B. are incidental to (and not, as in *Beanstalk*, independent of) its sublicense of the Gateway software. Accordingly, the fees Chesapeake receives for these services would seem to be precisely of the type the parties had in mind when they drafted provisions for splitting fees "relating to" (paragraph 6 of Amended Exhibit B) and "resulting from" (§ 6.B. of Amended Exhibit B) the licensing of the web-based version of Gateway software.[10]

Finally, even assuming that a portion of the fees Chesapeake collects from hosted clients represents the recovery of

---

[10]The fact that the parties chose this broad language, rather than the narrower "licensing fees," supports the interpretation that the parties intended to capture fees for ancillary services.

Chesapeake's own expenses, this does not preclude the interpretation that § 6.B. requires Chesapeake to calculate Gateway's royalties based on the totality of fees it receives. The parties' agreement that Chesapeake would keep seventy-five percent of fees it "actually collected" from its hosted customers, as opposed to only forty or fifty percent of the fees it collects from installed customers, appears to reflect the parties' expectation that Chesapeake would indeed incur additional expenses to service web-based clients, and to account for those heightened costs.

In sum, I conclude that Chesapeake's interpretation of § 6.B. is inconsistent with the text of the agreement, which on its face establishes a plausible fee-splitting arrangement that requires Chesapeake to pay Gateway twenty-five percent of all fees it collects "relating to" or "resulting from" its customers' use of Gateway's web-based software, including hardware fees.

Chesapeake next contends that even under Gateway's interpretation of § 6.B., Chesapeake, and not Gateway, is entitled to summary judgment of Gateway's claim of underpayment because Gateway's evidence of damages is speculative, lacking in foundation, and/or improperly produced after discovery had closed. I disagree. While Chesapeake's challenge to Gateway's evidence appears to have some merit,[11] portions of the record that are

---

[11]For example, Gateway relies heavily on the testimony and calculations of Orazio Pater, but Mr. Pater testified that his calculations were "an estimate" and reflcted an "arbitrary

undisputed are sufficient to establish that at least some fees were wrongly excluded from Chesapeake's royalties calculations.[12] Accordingly, while the total amount of Gateway's damages is disputed, the existence of damages is not, distinguishing this case from *Haslund v. Simon Prop. Group, Inc.,* 378 F.3d 653, 658 (7th Cir. 2004), and *Ace Hardware Corp. v. Marn, Inc.*, No. 06 CV 5335, 2008 WL 4286975 (N.D. Ill. Sept. 16, 2008), on which Chesapeake relies. I thus conclude that Gateway is entitled to partial summary judgment that Chesapeake breached the agreement by paying Gateway royalties on only a portion of the fees it "actually collected" from hosted customers of the Gateway software. The amount of Gateway's damages remains for trial, and the admissibility of Gateway's evidence will be addressed at that stage.

---

adjustment. Whether it is correct or not, I don't know." Mr. Pater further testified that "someone else would have to determine the exact amount of damages," and that Gateway's damages were "something that would have to be reconstructed by an accountant." Gateway's SOF, Exh. 6 at 172:23, 164:11-13, 187:8-16. Gateway has not, however, submitted expert accounting evidence. The admissibility of the evidence Chesapeake challenges may be revisited down the road to trial.

[12]Indeed, Chesapeake relies on this evidence to controvert Gateway's claim that "Chesapeake only reported to Gateway the software fees it received from ASP customers." *See* Chesapeake's Response to Gateway's SOF, Exh. 6. (Email from Chesapeake's Controller to Gateway's Orazio Pater, separately identifying amounts Chesapeake collected as "software hosting fees" and amounts collected as "hardware hosting fees" and explaining that "Gateway royalty share equals 25% of the software portion or $1,502.42.")

This leaves two claims of breach subject to cross-motions: whether Chesapeake breached the territorial restrictions of the agreement by marketing the Gateway software outside the United States; and whether Gateway breached the agreement's non-solicitation provisions.

On the first issue, Chesapeake does not dispute that it literally breached the agreement's territorial restrictions by marketing and licensing Gateway's software outside the United States and Canada. Indeed, Chesapeake admits that it licensed Gateway's software to the Government of Australia ("Australia") in June of 2010 and installed the software for use. Chesapeake also admits that it promoted the Gateway software at a banking conference in China. Chesapeake argues, however, that these activities do not amount to a material breach of the parties' agreement. Chesapeake claims that it cured any breach arising out of its agreement with Australia by terminating the agreement and refunding all license fees paid prior to Australia's implementation and use of the Gateway software. Chesapeake further points out that "no customer relationship was ever created" as a result of its promotion of Gateway's software in China.

I conclude that neither party is entitled to summary judgment on this issue. Gateway is entitled to damages only to the extent it can demonstrate that Chesapeake's breach was material. *Prima Tek II, L.L.C. v. Klerk's Plastic Products*, 525 F.3d 533, 538 (7th

Cir. 2008) ("a party can only be held liable for damages resulting from a material breach.")  Moreover, "only a 'material' breach justifies non-performance by the other party." *Sahadi v. Continental Illinois National Bank and Trust Company of Chicago*, 706 F.2d 193, 196 (7th Cir. 1983) (citing cases).  And I agree with Chesapeake that the materiality of its breach of the territorial restrictions of the agreement is a disputed factual question.  In Illinois, "[t]he determination of materiality must turn on the facts of each case." *Rubloff CB Machesney, LLC v. World Novelties, Inc.*, 844 N.E.2d 462, 468 (Ill. App. Ct. 2006).  In this case, the jury will have to consider, for example, the significance of each party's overseas activities in the context of their respective businesses overall, and whether the record supports the conclusion that Chesapeake acted in bad faith.[13]  Accordingly, this issue is not appropriate for summary judgment.

Turning now to Chesapeake's claim that Gateway solicited its customers in violation of the agreement, I again conclude that neither party is entitled to summary judgment.  It is clear from the record that Gateway contacted Barnes & Noble, Rotary, and

---

[13]In this connection, Chesapeake emphasizes that it disclosed its agreement with Australia to Gateway in its reports, undercutting any inference of duplicity on Chesapeake's part. On the other hand, the parties' relationship had by that time degenerated so substantially that Gateway had twice sent letters purporting to terminate the parties' agreement, and Chesapeake had stopped paying any royalties to Gateway--an odd moment for Chesapeake to assume that Gateway would countenance its extra-territorial licensing activities.

Thermo Fisher in an effort to enter into direct licensing relationships (and did, in fact, enter into such relationships) while these companies were using the software under sublicense agreements with Chesapeake. What cannot be determined on this record, however, is whether these acts amount to solicitation.[14] This factual question depends on the intent of the alleged solicitor, as well as the reasonable understanding of the person or entity allegedly solicited, *Henry v. O'Keefe*, No. 01 C 8698, 2002 WL 31324049, at *5 (N.D. Ill. Oct. 18, 2002) (Kennelly, J.), both of which issues may entail assessments of witness credibility and therefore are properly left for the jury.

Gateway's arguments that it did not, as a matter of law, solicit Chesapeake's customers are without merit. Gateway's first argument, which it raises for the first time in its summary judgment brief, is that the agreement's non-solicitation clause did not apply to the customers Chesapeake identifies in its claim. Section 3.5 of the 2003 Agreement states:

> Chesapeake may identify to Gateway its current customers,
> which identification shall be deemed Confidential

---

[14]In granting Chesapeake's motion for a preliminary injunction, I stated that there was "little doubt that Gateway has solicited Chesapeake's customers in violation of the parties' agreement." I presume that the parties understood this statement in its proper context, which required Chesapeake to show only that it was likely to succeed on the merits of its claim, not to prove the ultimate issue of whether Gateway had violated Section 3.5. Obviously, my statement was intended to convey the finding that Gateway had engaged in acts a jury could reasonably construe as solicitation, not to resolve the ultimate issue in dispute.

Information of Chesapeake and a Chesapeake trade secret (the "Chesapeake Customers"). Gateway may not solicit any Chesapeake Customers for licensing of its software or sales of any other products or services without the written consent of Chesapeake in its sole unfettered discretion; provided that this restriction shall not apply if: (A) Gateway shall already have licensed any of its software to such Chesapeake Customer on the Effective Date hereof, or (B) if Chesapeake shall not be actually marketing or promoting the Gateway Software to such Customer and after 10 days advance written notice by Gateway to Chesapeake, Chesapeake does not commence actively marketing such Gateway Software to such Customer, If Gateway violates this section, it shall promptly pay to Chesapeake 60% of all license or service fees it received from any Chesapeake Customer.

Gateway argues that "current customers" as used in this provision means Chesapeake's customers as of the date the 2003 Agreement was signed. Gateway further argues that to avail itself of the protections set forth, Chesapeake was required to provide Gateway with a "list" of such customers, which list would define the scope of the term "Chesapeake Customers." Because Chesapeake never furnished such a list, Gateway argues, it waived the protections afforded under Section 3.5.

Chesapeake, for its part, argues that the phrase, "Chesapeake may identify its current customers" means that Chesapeake could, throughout the parties' relationship, identify its then-current customers, and that these customers would then be off-limits to Gateway, regardless of whether Chesapeake identified them on a "list" or through other means, such as in their period royalty reports.

Each side claims to advance the only interpretation reasonably

23

supported by the language of the agreement and common sense. Gateway argues, for instance, that "Current Customers" cannot mean customers who sublicense Gateway's software through Chesapeake, because the agreement uniquely and consistently refers to these customers as "end users." Gateway also insists that the exceptions A and B carved out of Section 3.5's protections make no sense if "Current Customers" means "end users." Finally, Gateway argues that while it "made perfect sense" for Chesapeake to protect its "built-in customer base" at the time it signed the agreement in 2003, it did not need the same protection vis-à-vis customers it later signed (i.e., "end users"), since these would be "locked in" to their contracts with Chesapeake.

Chesapeake responds that Gateway's interpretation would render the protections of Section 3.5 meaningless, since it would protect only customers with long-standing relationships with Chesapeake, and not new customers of Gateway's software that Chesapeake invests time and resources to acquire. Furthermore, Chesapeake argues, the agreement makes no reference to any "list," much less does it require Chesapeake to provide such a list to avoid waiving the protections of Section 3.5

I conclude that both sides assert plausible textual (and contextual) arguments for their respective interpretations, and that the word "current" is reasonably susceptible to either of the competing constructions. Accordingly, I may look to evidence

outside the four corners of the agreement to determine the parties'
intent.  *See National Diamond Syndicate v. United Parcel Serivce*,
897 F.2d 253, 256 (7th Cir. 1990) (under Illinois law, a contract
is ambiguous only if it is "reasonably or fairly susceptible of
more than one construction," and only then may a court look to
extrinsic evidence of its meaning).  I conclude that the record
here favors Chesapeake's interpretation.

First, there is evidence indicating that Gateway executives
understood the agreement's non-solicitation provisions to apply to
end users of the Gateway software.  For example, in an email to G
Treasury sales representatives, G Treasury Senior Vice President
Mary Ann Rydel responded to the question, "is it All Chesapeake
Clients that are off limits or just those using
SmartTreasury/Gateway[?]" with an answer that began, "I would not
say totally off limits," and proceeded to outline a sales "tactic"
that "seemed to work for Rotary International."  Chesapeake SOF,
Exh. 25.  Surely, if G Treasury's Senior Vice President believed
that "SmartTreasury/Gateway" users were outside the scope of
Gateway's non-solicitation obligations, her answer would have been
very different, and she would have corrected her salesperson's
assumption to the contrary.  Moreover, Ms. Rydel's specific mention
of Rotary International (an end user of the Gateway software
through Chesapeake's contract with Bank of America) both supports
the interpretation that end users are indeed covered by Section

3.5, and undermines Gateway's additional argument that customers who use the software pursuant to Chesapeake's contract with Bank of America are not "Chesapeake Customers" under that section. (This latter argument is also attenuated by the fact that Gateway identifies, for the purpose of its claim that Chesapeake breached the agreement's "best efforts" clause, several Bank of America sublicensees among the customers Chesapeake allegedly "lost.") Lastly, I previously rejected Gateway's argument that Gateway cannot, as a matter of law, have solicited a customer that approached it first. Gateway's reargument of the issue on summary judgment presents no basis for revisiting my previous ruling. For all of these reasons, I conclude that Chesapeake's interpretation of Section 3.5 accurately reflects the parties' understanding. I now turn to Gateway's claim that Chesapeake is not entitled to lost profits or consequential damages, since the parties' agreement limits recovery to exclude such damages. Indeed, Section 7 of the 2003 Agreement reads,

> (A) IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY LOSS OF PROFITS, LOSS OF USE, CONSEQUENTIAL, SPECIAL OR INCIDENTAL DAMAGES ARISING UNDER THIS AGREEMENT, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; AND (B) IN NO EVENT WILL ANY DAMAGES ATTRIBUTABLE TO CHESAPEAKE OR GATEWAY EXCEED THE AGGREGATE AMOUNT OF PAYMENTS MADE OR PAYABLE TO GATEWAY UNDER THIS AGREEMENT THROUGH THE DATE OF THE EVENT GIVING RISE TO THE CLAIM.

On its face, then, the agreement forecloses certain of the

categories of damages Chesapeake seeks.[15]  Chesapeake contends that
these limitations are not applicable because the exception for
"willful conduct or gross negligence" set forth in the portion of
the limitations provision immediately preceding the above-quoted
language applies.  But Chesapeake acknowledges that its only claims
in this case are grounded in contract, and further acknowledges
(notwithstanding its allegation that Gateway's breaches are
"willful or grossly negligent") that Illinois law does not
recognize a claim for "willful breach."  Nor does Chesapeake's
further argument that the limitations provisions must be strictly
construed against Gateway mitigate the effect of the agreement's
plain language.  Gateway is entitled to summary judgment of
Chesapeake's claim for lost profits and consequential damages.

      Finally, I turn to the "specific performance" issue, which in
reality is not one issue but several.  A threshold matter is the
present status of the agreement.  Gateway contends that the
agreement was terminated on April 14, 2010 (or, at the latest,
thirty days later), and that it has had no further obligations to

_____

      [15]Chesapeake's argument that Gateway "does not explain how or
why any, much less all, of Chesapeake's damages fall into one or
more of the categories that Section 7 excludes" is perplexing.
In Count I of its amended counterclaim, Chesapeake explicitly
claims damages including "lost profits, loss of use,
consequential, special and incidental damages."  Of course, to
the extent Chesapeake claims damages that do not fall into these
categories, such as those it refers to as "direct" damages,
Chesapeake is entitled to present evidence to establish the
amount of such damages.

Chesapeake since that time. Meanwhile, Chesapeake insists that the agreement remains in force to this day, and it seeks specific performance of all of Gateway's obligations (and states that it stands ready to perform all of its own). I conclude that neither extreme is correct.

As discussed above, Gateway's putative termination of the agreement amounted to a breach of the contract. But as Gateway observes, even a wrongful termination is legally effective to end the parties' relationship. *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1251 (7th Cir. 1996) ("[w]hen a contract is terminated, even wrongfully, there is no longer a contract."). Accordingly, the contract is now terminated, and Gateway is liable to Chesapeake for its wrongful termination.[16]

The "normal remedy for breach of contract is an award of damages." *Miller v. LeSea Broadcasting, Inc.*, 87 F.3d 224, 230 (7th Cir. 1996). Specific performance is thus an "exceptional" remedy, which ordinarily comes into play only when damages are inadequate, such as when the breaching party is insolvent or the

---

[16]Although Gateway seeks a ruling that the agreement is terminated as of April 14, 2010, it seems to me that such a ruling potentially exposes Chesapeake to liability for actions it took in putative performance of the contract, which it reasonably believed to be in effect at the time, such as marketing the Gateway software to new customers. In light of Gateway's failure to follow the required termination procedure, Chesapeake was entitled (and arguably even required) to continue performing its contractual obligations, and it should not be exposed to liability based on a decision terminating the agreement retroactively.

injury to the non-breaching party is difficult to quantify. *Id*. The record in this case supports a partial grant of this exceptional remedy. On its face, the agreement expressly contemplates that certain of the parties' rights and obligations survive termination of the agreement. In particular, the agreement explicitly grants Chesapeake the right to use the "Source Code Version" of the software, which, by definition, includes "all Modules, and all subsequent Enhancements and Updates and derivatives thereof," beyond the term or termination of the agreement, to the extent necessary for Chesapeake to service its customers.[17] 2003 Agreement at § 9.4, 2005 Amendment at § 1.18. It is reasonable to infer that the parties deliberately provided for Chesapeake's post-termination access to the source code in recognition of both the difficulty of quantifying Chesapeake's damages in the event it abruptly lost functional access to the software (which presumably would cause it to be in breach of its customer agreements with customers), as well as of the adverse effects of such a loss on third parties. These factors support

---

[17]As I previously held, to the extent Chesapeake also requires "license keys" to enable its customers to use the Gateway software, Gateway has an implicit obligation to continue to provide license keys. *Gateway Systems, Inc. v. Chesapeake Systems*, No. 10 C 2276, 2010 WL 3714588, at *1 (N.D. Ill. Sept. 14, 2010). Chesapeake reiterates its request here for the license key "generator." While I decline to go so far as to order Gateway to provide this "generator," Gateway's obligation to provide Chesapeake renewed license keys is ongoing for as long as such keys are required to enable Chesapeake's clients to use the software.

granting specific performance of the unambiguous provisions of the contract.[18] *See Miller*, 87 F.3d at 230 (contractual obligation to third parties that would be breached absent specific performance of the contract in dispute is "a consideration favoring specific performance").

This analysis, however, does not similarly support Chesapeake's request for specific performance of the agreement's non-solicitation provision. Even assuming that Chesapeake ultimately prevails on its claim that Gateway breached Section 3.5, Gateway's obligations under that section do not survive termination. Indeed, the fact that Gateway's non-solicitation obligations are not indefinite, but rather end with the term (or termination) of the contract, was a factor I deemed important in concluding that the provision was enforceable. *See Gateway Systems, Inc. v. Chesapeake Systems*, No. 10 C 2276, 2010 WL 3714588, at *2, n.2 (N.D. Ill. Sept. 14, 2010). Moreover, Chesapeake cannot argue that its damages are difficult to quantify, since Section 3.5 itself establishes the damages to which Chesapeake is entitled in the event of Gateway's breach: sixty percent of the license or service fees Gateway receives from any

---

[18]I also conclude that regardless of Gateway's proposed interpretation of amended § 1.8 (whose meaning cannot be reliably ascertained due to its obviously erroneous punctuation), Gateway has breached its obligation, pursuant to amended §§ 1.18 and 9.1, to continue providing Chesapeake with the Source Code Version of the software, including "all Modules, and all subsequent Enhancements and Updates."

Chesapeake customer. *See Miller*, 87 F.3d at 230 (where losses from breach can be "exactly monetized, the case for specific performance collapses"). Accordingly, I conclude that Chesapeake is not entitled to specific performance of Gateway's obligation not to solicit Chesapeake Customers.

III.

For the foregoing reasons, the parties' cross-motions for partial summary judgment are resolved as follows: Chesapeake is entitled to partial summary judgment: that Gateway terminated the parties' agreement in breach of the agreement's termination provisions; that Chesapeake is entitled to receive, and Gateway must provide, the source code version of the Gateway software as provided in the parties' agreement, including "all Modules, and all subsequent Enhancements and Updates," and that Gateway breached §§ 1.18 and 9.1 of the parties' agreement by failing to provide these items; that Chesapeake did not breach the "best efforts" clause of the parties' agreement, nor did it breach the agreement by failing to provide first-line customer support, by failing to properly install the software, or by failing to refer customers to Gateway as provided in Section 4.7 of the agreement; and that Chesapeake did not anticipatorily repudiate the contract. Gateway is entitled to partial summary judgment: that Chesapeake underreported and underpaid certain license fees by excluding certain categories of fees Chesapeake received from its "hosted"

31

customers; that Chesapeake is liable for all royalties, properly calculated, that have not been remitted to any Gateway entity from the first quarter of 2010 through the present; that Chesapeake is not entitled to damages for lost profits or consequential damages; and that the agreement is no longer in effect (except with respect to the parties' ongoing rights and obligations set forth above). The following issues presented in these motions remain for trial: whether Gateway materially breached the contract by soliciting Chesapeake's customers in violation of Section 3.5 of the parties' agreement; whether Chesapeake materially breached the territorial restrictions in the agreement; and the amount of damages, if any, to which the parties are entitled as a result of the foregoing breaches.[19]

**ENTER ORDER:**

_Elaine E. Bucklo_
_____

**Elaine E. Bucklo**
United States District Judge

Dated: June 6, 2011

_____

[19]To be clear, the only count of the party's pleadings on which I enter a final judgment is Count II (captioned "Anticipatory Breach/Repudiation") of Gateway's second amended complaint, on which Chesapeake is entitled to judgment. The remaining claims remain pending, with their scope limited as set forth herein. *See ODC Comminications Corp. v. Wenruth Investments*, 826 F.2d 509, 515 (7th Cir. 1987)("The word 'judgment' in the term 'partial summary judgment' is a misnomer. A partial summary judgment is merely an order deciding one or more issues in advance of trial; it may not be a judgment at all, let alone a final judgment...").